STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2024 CA 0271

DORSEY DEVELOPMENT DG, L.L.C.

VERSUS

TANGIPAHOA PARISH COUNCIL-PRESIDENT GOVERNMENT AND
TANGIPAHOA PARISH PLANNING COMMISSION

*Judgment Rendered:* OCT 0 3 2024

* * * * * * * *

Appealed from the
21st Judicial District Court
In and for the Parish of Tangipahoa
State of Louisiana
Case No. 2023-1289, Division D

The Honorable Brian K. Abels, Judge Presiding

* * * * * * * *

| | |
|---|---|
| Andre G. Coudrain<br>Brittany L. Schroder Michael<br>Hammond, Louisiana | Counsel for Plaintiff/Appellant<br>Dorsey Development DG, L.L.C.<br>and Loucile Comish/Intervenor |
| Christopher M. Moody<br>Albert D. Giraud<br>Hammond, Louisiana | Counsel for Defendants/Appellees<br>Tangipahoa Parish Council-<br>President Government and<br>Tangipahoa Parish Planning<br>Commission |

* * * * * * * *

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**THERIOT, J.**

In this suit arising from the denial of a commercial development application by the Tangipahoa Parish Council-President Government ("Council") and the Tangipahoa Parish Planning Commission ("Planning Commission"), the developer and the property owner appeal the trial court's dismissal of their suit. For the reasons set forth herein, we reverse.

## FACTS AND PROCEDURAL HISTORY

Dorsey Development Company, L.L.C. ("Dorsey") is a commercial real estate development and construction company and a preferred developer for Dollar General. On July 25, 2022, Dorsey entered into a purchase agreement with Loucile Comish to purchase 2.65 acres of land located on the southwest corner of La. Hwy. 22 and Dutch Lane ("the Property") in Pontchatoula, Louisiana for the purpose of developing a Dollar General store on the site ("the Project"). Dorsey also entered into a lease agreement with Dollar General for the Property. Both the purchase agreement and the lease agreement were contingent upon the allowed use of the Property for the construction and development of a Dollar General store. Thereafter, on January 3, 2023, Dorsey, through its authorized agent, Gregory Bivin, submitted a Commercial Development Application to the Tangipahoa Parish Planning Department, seeking approval to develop the Property for a Dollar General Market store,[1] along with the required documentation, including site plans, drainage calculations, wetlands determination, DOTD permit, storm water pollution prevention plan, 911 address verification letter, LDH approval, and sewer treatment plant permit.[2] On February 27, 2023, Dorsey was notified by the

---

[1] A Dollar General Market store is larger than a typical Dollar General store (12,480 square feet vs. 9,100 square feet) and offers a more diverse and expanded food selection than typical Dollar General stores, including fresh fruits and vegetables and a variety of meat and dairy products, as well as an increased assortment of cough and cold, dental, nutritional, medical, health aids, and feminine hygiene products.

[2] The LDH approval and sewer treatment plant permit were not submitted with the application, but were provided at a later date.

Planning Department that the Project "satisfied all requirements needed to proceed to the Planning Commission meeting."

The Planning Commission held a public hearing on Dorsey's request for approval on March 7, 2023.[3] Planning Director Tracie Schiliace presented the request to the Planning Commission, noting that the Project satisfied all requirements for approval by the Planning Commission. Counsel for Dorsey, Andre Coudrain, presented the Project at the hearing and answered questions. Eleven citizens spoke in opposition to Dorsey's request at the hearing. Concerns raised by the citizens who spoke at the public hearing included concerns about crime, increased traffic, drainage problems, the impact on "mom and pop" businesses in the area, diminished property values for homes in the area, and property conditions at other Dollar General stores, such as cluttered aisles and litter. Emails and letters were also submitted to the Planning Commission in opposition to the Project. After an initial motion to deny Dorsey's request for approval failed to pass, a second motion was made by Commissioner Julius Scott to deny Dorsey's request "based on the health, safety, and welfare of the residents of Tangipahoa Parish." This motion passed by a vote of 6-2, and Dorsey's application was denied without any further explanation of the reasons for the decision.

Dorsey filed an appeal of the Planning Commission's decision with the Council pursuant to § 36-4 of the Tangipahoa Parish Code of Ordinances.[4] The Council held a public hearing on the matter on March 27, 2023, immediately prior

---

[3] An audio recording of the March 7, 2023 Planning Commission meeting is filed in the record before us.

[4] Tangipahoa Parish Code of Ordinances § 36-4 provides:

> Sec. 36-4 - Appeal of a planning commission decision.
>
> Upon an unfavorable ruling upon any development proposal by the planning commission, the developer/owner may appeal directly to the parish council. As part of his appeal he must, however, present the written decisions of the planning commission. It will be brought before the parish council at a regular meeting and the decision of the parish council will be rendered in writing.

to the Council meeting at which Dorsey's appeal was considered.[5] The only documentation of the public hearing is in the Council minutes, which state simply that seven individuals spoke in opposition to the Project at the public hearing and Mr. Coudrain spoke on behalf of Dorsey. No further detail was given about the types of concerns raised at the public hearing or Dorsey's response to those concerns. At the Council meeting, Mr. Coudrain presented Dorsey's appeal to the Council and explained that since the Project meets all requirements for approval, the Council's decision on this matter must have a rational basis and not be arbitrary or capricious. Following Mr. Coudrain's statement, Mr. Coudrain and Mr. Bivin answered questions from the Council. Councilperson Kim Coates asked Mr. Coudrain whether Dorsey could build something other than "this commercial facility" on the Property. Mr. Coudrain explained that although Dorsey works on other projects outside of their work for Dollar General, for this Project, Dorsey is already engaged with Dollar General and the Property owner, Mrs. Comish, for the development of a Dollar General store on the Property. Mr. Coudrain suggested that rather than questioning whether Dorsey could develop the Property for a different purpose, Councilperson Coates should ask Mrs. Comish whether she could sell the Property for a comparable price to a different purchaser for a different use. Councilperson Joey Mayeaux asked how Dorsey or Dollar General determines when and where to build another Dollar General. Mr. Bivin explained that Dollar General does demographic research to determine whether a Dollar General store will be profitable in a given area. In the event that Dollar General determines that a store will be profitable in a specific area, as it did in this case, it then provides Dorsey with a specific target area, generally at the intersection of a major highway, and Dorsey attempts to locate property as close to that point as

---

[5] Although a video recording of the Council meeting is filed in the record of this matter, the video begins midway through the Council meeting when the Council took up the matter of Dorsey's appeal. The public hearing, which took place before the start of the meeting, is not included in the video.

4

possible to purchase for development. Finally, the parish attorney asked whether Dorsey acknowledges that the Property could be used for some other commercial or private purpose, such as a coffee shop, bed and breakfast, or a private residence, or whether Dorsey contends that the Property is being taken out of commerce by the denial of its application. Mr. Bivin answered that Dorsey does not own the property, and that question would be more appropriately directed to the Property owner, Mrs. Comish. Mr. Coudrain added that the Property owner's hypothetical ability to use the Property for any other private or commercial purpose would be subject to applicable development rules. There were no other questions at this point, and the Council Chair, David Vial, called for a motion on the matter. No motion was made, and Council Chair Vial declared that the ruling of the Planning Commission would stand. Although the Council minutes reflect this disposition of Dorsey's appeal, no reasons were provided for the decision.

On April 10, 2023, Dorsey filed suit against the Tangipahoa Parish Council-President Government and the Tangipahoa Parish Planning Commission, seeking declaratory judgment, approval of its application, and issuance of the permit. Dorsey alleges that the Property is not zoned, the intended use is an allowed use, and its permit application meets all of the requirements of the Parish development ordinance. Furthermore, neither the Planning Commission nor the Council identified a specific problem or manner in which the Project failed to protect the public health, safety, or general welfare of residents. Dorsey alleges that the Planning Commission's denial of its permit application and the Council's refusal to grant its appeal and reverse the Planning Commission's decision were arbitrary, capricious, and without any rational basis as to the health, safety, or welfare of the residents.

Dorsey sought a declaratory judgment declaring the actions of the Planning Commission and the Council to be arbitrary and capricious and having no rational

5

basis; an order for the Planning Commission or the Council to approve its permit application and issue a permit for the Project; and an award of damages to the extent the wrongful actions of the Planning Commission and the Council result in damages to Dorsey, including, but not limited to, lost profits, loss of preferred developer status, and the costs incurred in obtaining contractual agreements, approvals, and permits in furtherance of the Project, as well as reasonable attorney fees and costs.

The owner of the Property, Loucile Comish, intervened in the suit, alleging that the actions of the Planning Commission and Council were arbitrary and capricious and an abuse of discretion. Mrs. Comish's petition further alleged that the denial of Dorsey's application will prevent her from the lawful and allowed use of her property and result in the loss of the sale of her property to Dorsey at an attractive price. Mrs. Comish sought a declaratory judgment declaring that the actions of the Planning Commission and the Council were arbitrary and capricious and having no rational basis and an abuse of discretion; an order that the Commission or the Council approve Dorsey's application; and an award of damages to the extent that the wrongful actions of the Planning Commission and Council result in damages, as well as court costs, attorney fees, and litigation expenses.

Dorsey and Mrs. Comish supplemented and amended their petitions on August 3, 2023 to add additional allegations regarding their damages and to assert claims for violations of their rights under the Louisiana and United States Constitutions. The constitutional claims were based on the fact that the Planning Commission had previously approved the development of other Dollar General stores (and other similar stores) in other locations in Tangipahoa Parish, but denied Dorsey and Mrs. Comish's request for approval for the Project arbitrarily, capriciously, and without reasonable or justifiable cause.

6

In a joint pretrial order signed by counsel for the parties, the parties agreed to a number of uncontested material facts, including: the Planning Commission has previously approved other Dollar General stores in Tangipahoa Parish; Dorsey's application does not request a variance from any Tangipahoa Parish or Planning Commission requirements; Dorsey's application does not violate any parish land use restrictions; the Project is an allowed use of the Property under all applicable zoning laws; the application and the documents filed in support meet all site plan rules of the parish and the Planning Commission; Dorsey ordered and submitted a voluntary traffic study to the Planning Commission that concluded that no additional roadway improvements were required; a dedicated center/left turn lane on La. Hwy. 22 in the area of the Property is already in existence; Dorsey obtained approval for the Project from DOTD, the State Fire Marshal, and the Louisiana Department of Health; the Project's drainage design was approved by the parish engineer and the parish Drainage Board, whose members are also members of the Council; the Planning Commission's denial of Dorsey's application based on health, safety, and welfare did not provide any further explanation for the reasons for the denial; and Dorsey's appeal to the Council was timely.

On joint motion of the parties, the trial of the matter was bifurcated, with the issue of liability set for a bench trial on September 20, 2023. The parties agreed that, depending on the outcome of the liability portion of the trial, trial on the issue of damages would be set for a later date.

Gregory Bivin, director of Dorsey's permit department, testified at length at trial regarding his experience developing Dollar General stores and this Project in particular, and addressed the concerns expressed by opponents to the Project. According to Mr. Bivin's testimony, Dorsey has received approval for twelve Dollar General stores in Tangipahoa Parish since 2012, and he has personally

worked on four Dollar General store projects in Tangipahoa Parish since beginning his employment with Dorsey four years earlier, although none of the existing stores in Tangipahoa Parish are Dollar General Market stores. Mr. Bivin explained that Dollar General does extensive demographic research before proposing locations to Dorsey for development, and Dollar General Market stores are chosen for areas with a higher average median income, because those stores sell more "premium type products," rather than the discounted products that a traditional Dollar General store might sell. Mr. Bivin identified some of the differences between Dollar General Market stores and traditional Dollar General stores: Dollar General Market stores are significantly larger than the traditional Dollar General stores, primarily to accommodate the additional grocery items that they provide; Dollar General Market stores have a significantly increased amount of perishable items, such as fresh fruit, food, vegetables, produce, meats, and bakery items; the exterior architecture of Dollar General Market stores is "upgraded" to a more attractive design, with new signage; and the interior of Dollar General Market stores has "a more open feel," with somewhat wider aisles and not as much "clutter." Mr. Bivin explained that he believes that development of a Dollar General Market store on the Property would be good for the community of "6,000 or so people that live in a two mile radius" because it would provide "a nice store with fresh fruits and vegetables and the expanded grocery store items, more premium products, in an area that is between two grocery stores in two different towns." He also projected that the Project would generate sales tax revenue of $1.1 million to the parish over fifteen years.

Mr. Bivin testified that prior to beginning the Project, he reviewed the parish's land use ordinances to be sure that the Project and site would meet all requirements of the municipality. In this case, he found nothing in the pertinent land use ordinances that would prevent the development of a Dollar General

8

Market store on the Property. After entering into the purchase agreement with Mrs. Comish and the lease agreement with Dollar General, Dorsey engaged testing labs, surveyors, engineers, architects, and structural engineers to begin developing plans, drainage studies, and traffic studies[6] for the application, at considerable expense to Dorsey. Dorsey provided the Planning Commission with all necessary approvals and information required for the Project, including approvals by DOTD, the State Fire Marshal, and the Louisiana Department of Health, and a wetlands determination, and was notified that the Project satisfied all technical review requirements and was approved to proceed to the Planning Commission meeting for approval. As a supplement to its application, Mr. Bivin prepared a PowerPoint presentation on the Project for the Planning Commission hearing that included photographs and information on the concept of Dollar General Market stores and how they differ from traditional Dollar General stores, the site plan, the various approvals obtained for the Project, job creation estimates, and information about Dollar General's charitable endeavors and investment in the communities in which it operates.

Although many residents opposed to the Project expressed concerns about delivery trucks backing into the parking lot or blocking the highway, Mr. Bivin explained that one requirement to obtain DOTD approval for a site plan is that delivery trucks must be able to enter the site, make the delivery, and exit the site without blocking traffic. Due to this DOTD requirement, Dollar General requires Dorsey to submit a site plan, prepared by an engineer, that depicts a delivery truck's turning movements, showing the truck coming from either direction and being able to pull in and back up to the delivery area in a single movement without crossing any parking spaces. Mr. Bivin testified that the ability to complete that

---

[6] Mr. Bivin testified that although DOTD did not require a traffic study for the Project, the Planning Commission had previously requested that Dorsey obtain and submit a traffic study for its consideration on all future projects, whether or not one was required by the parish or by DOTD.

maneuver is a very early consideration for Dollar General, and Dollar General has not approved any proposed project for Dorsey in the last ten years or so that cannot satisfy this requirement. In the instant matter, he testified that the site plan approved by Dollar General and by DOTD and submitted to the Planning Commission with Dorsey's application for the Project satisfied these requirements.[7] On cross-examination, Mr. Bivin was shown a photograph depicting a delivery truck parked on the shoulder of a road in front of a Dollar General store while making a delivery. After reviewing the photograph, he testified that the store appeared to be "an older store [that] may have been developed before DOTD and [Dollar General] were reviewing the Auto-TURN movements," and pointed out that the parking lot in the photograph is different in design from the parking lot planned for the Project and would not have allowed the truck to perform the maneuvers depicted in the engineered site plan for the Project. Mr. Bivin explained:

> [T]he design [of the parking lot depicted in the photograph] is different. When you center the driveway on the parking lot like that, that truck can't maneuver in, nose to the side, and then back into a space. So generally, on our newer projects, that [driveway] would be offset so that the truck could pull in the front, pull across the front of the store and back up to the delivery area.

He expressed confidence in the site plan design and the turning maneuvers calculated and approved by engineers for the Project in order to prevent such problems with delivery trucks. Nevertheless, in the event that a delivery driver chooses to park on the shoulder of the highway to make a delivery, Mr. Bivin pointed out that law enforcement could be called upon to issue a citation to the driver and rectify the situation. Finally, regarding residents' concerns over traffic issues created by the Project, Mr. Bivin noted that there is already a dedicated turning lane on Highway 22 for the Property, and Dorsey obtained a traffic study

---

[7] Mr. Bivin could not say for certain whether the site plan submitted to the Planning Commission with Dorsey's application included the additional diagram showing turning maneuvers, as that diagram was only needed for Dollar General and DOTD approval.

for the Project at the Planning Commission's request and submitted the traffic study with its application, along with the DOTD approval.

Mr. Bivin also testified about the drainage concerns raised by residents, who believe that the Project will cause flooding in the area. Mr. Bivin explained that the drainage study obtained by Dorsey for the Project concluded that there would be less water leaving the site in the post-development state than in the pre-development state. This drainage study, prepared by engineering firm SJB Group, LLC, was submitted to the Planning Commission with Dorsey's application and introduced into evidence at the trial. The drainage study notes that the Property is currently undeveloped land with dense woods that drains into existing roadside ditches and that the proposed improvements to the property will include onsite installation of a dry detention basin and subsurface drainage in order to maintain pre-developed flow rates and patterns. The drainage study concludes:

> Based on the calculations provided in this report, the proposed development will reduce the 25-year and 100-year peak runoffs from the property by greater than 10% due to detention provided. Therefore, it is our opinion that this development, with the improvements proposed, will be acceptable with respect to storm drainage.

Mr. Bivin also disagreed with the concerns expressed about the cluttered condition of Dollar General stores, stating that he had visited four Dollar General stores in the week or so before trial, three of which were in close proximity to the Property, and found all four stores to look nice, with clean aisles that were "all picked up." He testified that Dorsey's store designs, including aisle widths, are ADA-compliant and approved by the State Fire Marshal. Nevertheless, once a store is opened, if the aisles are blocked by boxes, any safety violations could be addressed by the Louisiana Fire Marshal or local code enforcement.

Tangipahoa Parish resident Virgil Allen, who spoke in opposition to the Project at the Planning Commission's public hearing and at the public hearing

11

before the Council meeting, testified at trial about his opposition to the Project. Mr. Allen lives approximately 1,500 feet from the Property, and he has many relatives who also live close to the Property. Mr. Allen testified that his opposition is based on concern for the general health, welfare, and safety of his community. He expressed concern that the Project would create dangerous traffic conditions, since the Property is in a residential area where school buses make frequent stops. He also expressed concern about drainage issues arising from the Project. While Mr. Allen admitted that he is aware of the drainage study concluding that there would be less water leaving the site post-development than pre-development, he does not agree with the engineering firm's conclusion. Mr. Allen testified that he has lived in the area for fifty-five years and has observed water levels rising as more and more houses are built and slabs and concrete replace trees, dirt, and grass. Mr. Allen testified that he believes the additional concrete resulting from development of the Property will cause homes adjacent to the Property to flood in the event of a major storm. Mr. Allen also expressed concern that, since the Property is located outside of the city limits, the Project would take sales tax revenue away from the city of Pontchatoula, and if the Project is approved, the existing "quality" grocery stores in surrounding communities may close down and a "criminal element" will be attracted to the area. Mr. Allen also took issue with the fact that Dollar General is not a local business and, in his experience, has not made charitable contributions to the community.

Planning Commission Member Julius Scott testified about the Planning Commission's consideration and denial of Dorsey's application. Commissioner Scott made the motion to deny Dorsey's application for the health, safety, and welfare of the residents of Tangipahoa Parish. He acknowledged that the public's opposition to the Project was "probably one of the biggest oppositions I think we've ever seen at the planning board meeting," but testified that his decision to

vote against the Project was based on health, safety, and welfare, rather than simply the amount of opposition the Project received. Mr. Scott's biggest concern with the Project was traffic, although he admitted that he did not review the traffic study submitted by Dorsey with its application. He expressed concern about the close proximity of the parking lot entrance to an intersection, as well as the likelihood that 18-wheelers would back into the parking lot from the highway. Mr. Scott admitted that he had seen the site plan diagram prepared for Dollar General depicting turning maneuvers for delivery trucks, but maintained that he still had doubts based on his personal experience driving 18-wheelers that these maneuvers could be executed easily or safely by anyone but a very skilled driver. In addition to his traffic concerns, Mr. Scott also had concerns about property conditions at dollar stores. Mr. Scott testified that the Dollar General store near his home is a "nice store" and is always clean; however, he testified that this is not the norm, and his observations of cluttered aisles and litter at other dollar stores factored into his vote against the Project.

Tangipahoa Parish Councilperson Kim Coates testified that the Property is located in her Council district, and the residents of her district oppose the Project. She testified that she received emails from concerned citizens opposing the Project, as well as an online petition signed by at least 700 people opposing the Project. However, she acknowledged on cross-examination that many of the signatures on the online petition were from people who lived either out of state or outside of the area. In addition to considering her constituents' opinions, Ms. Coates testified that she did her own research on the internet about dollar stores. The articles she read online about crime and poor labor practices at dollar stores "backed up" her personal beliefs about the Project, although she admitted that she has never been in a Dollar General Market store before. Ms. Coates expressed concerns about drainage and increased 18-wheeler traffic in the area, and she testified that she had

personally observed 18-wheelers at other Dollar General store locations backing in from the highway or parking on the shoulder of the highway to unload. Despite her expressed concerns about increased traffic, she testified that she did not review the traffic study submitted by Dorsey and approved by DOTD. Ms. Coates was also opposed to the Project because of its location outside of the city limits, which she explained is harmful to the city's economy because it takes tax dollars away from the city. Finally, Ms. Coates expressed vague concern about "blight" in the event that the Dollar General Market store closed down and a vacant building remained on the Property. Despite her strong opposition to the Project, Ms. Coates testified that she did not make a motion to deny Dorsey's appeal when the matter was before the Council because she "just didn't want to make a motion at all . . . [because] I didn't feel like that [sic] it needed it." Since no motion was made, the Council did not vote on the issue.

Tangipahoa Parish Councilperson Brigette Delatte Hyde also testified at trial concerning Dorsey's appeal to the Council. Ms. Hyde testified that she had not decided how she would vote on the matter prior to the Council hearing, and since no motion was made to grant or deny the appeal, she never had the opportunity to vote on the matter. Nevertheless, she testified that the three "dollar stores" in her Council district are not well received by residents and that she does not want any more dollar stores in her district. Her concerns about the Project, which are based on her personal experiences with other Dollar General stores, include traffic, safety of store employees and customers, and problems with litter. Despite these concerns, Ms. Hyde testified that she did not make a motion to deny Dorsey's appeal because the Project is not in her district and that Council members typically do not make motions in matters concerning another Council member's district.

Loucile Comish, the current owner of the Property, testified that she has lived on or near the Property for many years and believes that the Project is a good

thing for the community. The Property was originally part of a larger seven-acre tract of land Mrs. Comish's husband inherited from his father. Mrs. Comish testified that she and her husband lived on the larger tract for about ten years before subdividing the land into three tracts of approximately two and a half acres each for sale. Two of the three subdivided tracts have already been sold, and a house has been built on one tract and apartments have been built on the other. The Property at issue in this matter is the last remaining tract she has for sale. She testified that Dorsey has agreed to purchase the Property for $210,000.00; however, Dorsey's offer is contingent upon approval to develop the Property for a Dollar General Market store. Mrs. Comish has only received one other offer to purchase the Property. That offer was for $50,000.00, which she considered "very low." Regarding the opposition to the Project from area residents, Mrs. Comish testified that she has lived in a subdivision close to the Property for the last twenty years, and as a resident of the area, she believes that the development of a Dollar General Market store on the Property would be good for the area because there are currently no other stores close by that offer meat and fresh produce. Mrs. Comish is familiar with Dollar General Market stores and has been in Dollar General Market stores in other locations, and she disagrees with the concerns raised about the Project.

The defendants' expert, Kennedy Smith, testified at trial via Zoom. Ms. Smith was accepted by the court as an expert in community economic development. Ms. Smith testified, based on her research, about various problems created by dollar stores, such as threatening existing and potential businesses in the area, especially grocery stores; creating fewer jobs with lower wages than other stores; increasing crime; and extracting wealth from the community. Ms. Smith testified that, based on her research, there is not sufficient market demand to support a new store of any kind on the Property, and the proposed Dollar General

15

Market store would have a negative impact on other stores in the area, potentially "displacing about . . . 1.4 million dollars in sales from other businesses that are nearby."

The trial court issued written reasons for judgment dated November 8, 2023, in which it found that the Planning Commission and the Council acted in accordance with Tangipahoa Parish Code of Ordinances § 36-2[8] in denying Dorsey's request based on the health, safety, and welfare of the residents of the area. The trial court found that the Planning Commission and the Council did not act arbitrarily or capriciously and that "their decisions were actually motivated by concerns which are rationally related to legitimate governmental interests like public health, safety, and the general welfare (specifically traffic and drainage concerns)." The trial court issued a judgment on January 15, 2024 dismissing the action in its entirety. This devolutive appeal followed, in which Dorsey and Mrs. Comish assign the following as error:

> 1. When considering the Tangipahoa Planning Commission's denial of a fully compliant application for a use by right, the trial court erred in applying a rational basis standard rather than a strict scrutiny standard, in placing the burden of proof on the owner/developer rather than the local government, and in supporting the denial with a factual conclusion contrary to existing Parish Ordinances.

---

[8] Tangipahoa Parish Code of Ordinances § 36-2 provides:

§ 36-2 – Purpose

(a)These regulations by the ordinance from which this chapter is derived are aimed at guiding/visualizing development in accordance with the future needs of the parish in order to protect, promote and improve the public health, safety, morals, convenience, order, appearance, prosperity and general welfare.

(b)The regulations enacted by the ordinance from which this chapter is derived are designed to exercise the full range of authority available to the parish under state law to:

(1)Promote the public health, safety and general welfare, while recognizing the rights of real property owners, by adopting a development ordinance.

(2)Lessen congestion in streets and to secure safety from natural disaster, fire, panic and other dangers.

(3)Facilitate the adequate provisions of streets, water, sewerage, drainage and other public requirements by establishing minimum standards.

(4)Carry out such other purposes in the public interest as may be specifically cited in these regulations.

16

2. The Tangipahoa Planning Commission's denial of the application was unreasonable, arbitrary, and capricious when it failed to construe [the existing] Parish Ordinances in favor of the use proposed by the owner or apply them uniformly, it disregarded factual evidence required by Parish Ordinances produced in the Application, and it relied solely on public opinions and personal speculations unsupported by evidence.

## DISCUSSION

Where, as here, a property owner seeks to use his or her land in compliance with the applicable zoning, requiring no variances or special uses, and conforming to every modification imposed by law, that property owner is seeking to exercise his or her "use by right." *Honeybee Holdings, LLC v. St. Tammany Parish Zoning Commission*, 2023-1051, p. 14, n. 8 (La.App. 1 Cir. 5/31/24), --- So.3d ---, ---. In a situation when a landowner seeks a use by right, the use by right should be presumptively valid and approved. *Id.*

A legislative body's decision to deny a use by right, in compliance with the applicable zoning ordinances, is subject to strict scrutiny, not the normal standard of broad discretion applied to variance cases. *Zachary Housing Partners, L.L.C. v. City of Zachary*, 2012-1952, p. 4 (La.App. 1 Cir. 10/10/13), 185 So.3d 1, 4, *writ denied*, 2013-2615 (La. 2/7/14), 131 So.3d 864.[9] The reviewing court does not consider whether the trial court manifestly erred in its findings, but whether the legislative body acted arbitrarily, capriciously, or with any calculated or prejudicial lack of discretion. The test of whether an action is arbitrary or capricious is

---

[9] In *Zachary Housing Partners, L.L.C.*, the plaintiff's use by right application to develop an apartment complex was denied by the City Council. At the City Council meeting where the application was considered, members of the community expressed concerns about the oversaturation of apartment complexes in the city, flooding, sewage and drainage, traffic (specifically, non-resident students catching buses at apartment complexes located in the city), fire, noise, lighting, impact on wildlife, property values, potential apartment complex residents ruining the local school system, and the attraction of "riff-raff" to the area. Despite the concerns raised by the community in opposition to the project, the City Council's sole articulated reason for the denial of the plaintiff's application was "incompatibility" with the city's Master Plan. Although the plaintiff was attempting to use the land in accordance with its current official zoning designation, i.e., "Residential/Urban," the city's Master Plan designated the future use of the property as "Agricultural and Forestry," which meant that at some undetermined point in the future, the property would be rezoned based on the future land use designation set forth in the Master Plan. The trial court found, and this Court agreed on appeal, that the City Council's denial of the plaintiff's use by right of its land under these circumstances was arbitrary and capricious and "teeters dangerously on the edge of becoming an unconstitutional taking of property and a due process violation." *Zachary Housing Partners, L.L.C.*, 2012-1952 at p. 10, 185 So.3d at 7.

17

whether the action is reasonable under the circumstances. *Zachary Housing Partners, L.L.C.*, 2012-1952 at pp. 4-5, 185 So.3d at 4.

Additionally, while a legislative body may take into account certain factors affecting the public, such as public safety, health, and general welfare, in considering a use by right application, those concerns must be legitimate public concerns and supported by evidence in order to meet the heightened burden imposed on the legislative body in a use by right situation. See *Falcon v. Parish of Jefferson*, 2022-526, p. 12 (La.App. 5 Cir. 6/14/23), 367 So.3d 857, 865-66.[10]

Tangipahoa Parish Code of Ordinances § 36-2 sets forth the purpose of the Planning and Development regulations and states that those regulations are "designed to exercise the full range of authority available to the parish under state law to . . . [p]romote the public health, safety[,] and general welfare, while recognizing the rights of real property owners, *by adopting a development ordinance*." (Emphasis added). However, no development ordinance was adopted that would prevent the proposed use of the Property for the Project, and it is

---

[10] In *Falcon*, the plaintiff's use by right application to develop a subdivision was denied by the Council after concerns were raised by residents of a nearby neighborhood about the development exacerbating existing traffic and speeding problems in the area and negatively impacting quality of life. The trial court found that the Council's denial was arbitrary and capricious, noting that although concerns from residents may be a factor of consideration, the Council cannot rely solely on the residents' opinions to deny a use by right application. The trial court pointed out that there appeared to be "several workarounds to ease the potential for traffic," but none were explored by the Council before denying the developer's application. *Falcon*, 2022-526 at p. 5-6, 367 So.3d at 861-62. On appeal, the Fifth Circuit affirmed, finding that the Council's decision did not meet the heightened burden imposed in a use by right situation and was unreasonable, arbitrary, and capricious. The Court noted that there was no support in the record for the residents' speculation that the development would allow for an extra 100 cars per day and contribute to speeding issues. The Court also pointed out that a resident who testified at the hearings and at trial about his speeding concerns admitted that he had not called the Sheriff's Office regarding the speeding issues or requested stop signs for the street and acknowledged that a viable option for dealing with the concerns would be to have law enforcement enforce the law. *Falcon*, 2022-526 at pp. 13-15, 367 So.3d at 866-67. Finding that the asserted legitimate safety concerns were unsupported by evidence, the Court concluded:

> [U]nder the particular facts and circumstances presented in this case, the Council's decision to deny the plaintiff's application for resubdivision bears so little relationship to public safety, health, or general welfare as to render it unreasonable, arbitrary, and capricious. While we do not take the concerns voiced by neighborhood residents regarding the current traffic violations in their neighborhood lightly, we find that there is simply no evidence in the record that supports the conclusion that approval of the plaintiff's resubdivision would exacerbate the traffic violations in their neighborhood. The remedy for the issues that the neighborhood residents are experiencing with traffic violations is through traffic enforcement by the appropriate authorities, not the denial of the plaintiff's resubdivision based on mere unsupported speculation that it would contribute to those problems.

*Falcon*, 2022-526 at pp. 14-15, 367 So.3d at 867.

18

uncontested that the Project does not violate any land use restrictions and is an allowed use of the Property under all applicable zoning laws.

The Planning Commission voted to deny Dorsey's use by right application based on the "health, safety, and welfare of the residents of Tangipahoa Parish," with no further explanation of the reasons for the denial provided. Since the Planning Commission failed to provide an explanation for the denial, we are somewhat limited in our assessment of the reasonableness under the circumstances of the Planning Commission's decision. However, a review of the documents submitted to the Planning Commission for consideration, the audio recording of the Planning Commission hearing, and the testimony of Commissioner Scott is helpful.

It is clear from the audio recording of the Planning Commission hearing that there was a large, vocal, and at times unruly crowd present at the hearing to oppose the Project, who continued to argue loudly with the Commissioners when told that there was no basis upon which Dorsey's application could be denied, until the Planning Commission eventually voted to deny the application based on health, safety, and welfare concerns without any further explanation. Nevertheless, Commissioner Scott testified at trial that his motion and vote to deny the application were not based on the amount of opposition from the public, but rather on concerns for the health, safety, and welfare of the community. He identified traffic as his biggest concern with the Project. However, the fact that he admittedly did not review the traffic study obtained and submitted by Dorsey at the request of the Planning Commission casts doubt on the reasonableness of the decision to deny the application based on traffic concerns. Commissioner Scott also expressed skepticism that delivery truck drivers could maneuver around the proposed parking lot without backing in from the highway, despite Dorsey's engineered site plan diagram showing that the parking lot design allowed this to be

19

done. Finally, Commissioner Scott expressed concerns about poor property conditions at some stores, even though he testified that the Dollar General store near his home is very nice and clean. When questioned about the absence of facts and evidence to back up his stated concerns for health, safety, and welfare, Commissioner Scott explained that he does not believe that he has to rely on the various drawings, studies, and approvals submitted for the Project, since he believed "a lot of those approvals are just rubber stamped," and since he feels in his heart that his personal opinion on the matter should be enough. Additionally, although several residents who spoke at the Planning Commission hearing expressed concerns about drainage problems that would result from the development, the drainage study submitted by Dorsey concluded that the planned improvements would actually improve drainage. Finally, although a number of other concerns were raised by residents, such as crime, diminished property values, and damage to "mom and pop" businesses in the area, no evidence was offered to show how the Project proposed by Dorsey differed from the other Dollar General stores previously approved by the Planning Commission so as to warrant denial of this application based on these concerns. After a thorough review of the evidence, and applying strict scrutiny to the Planning Commission's decision to deny Dorsey's use by right application, we cannot say that the Planning Commission's decision was reasonable under the circumstances.

Further, although Tangipahoa Parish Code of Ordinances § 36-4 provides for an appeal of Planning Commission decisions by the developer/owner directly to the Council, after which "the decision of the parish council will be rendered in writing," the only written decision arguably rendered by the Council was in the minutes of the Council meeting:

REQUEST FOR APPEAL of Planning Commission decision dated 3/7/23 by applicant Dorsey Development, LLC, Dollar General Store #2023-11, 12334 Hwy 22 West, Pontchatoula, LA, District 10 Andre

Coundrain, Legal Counsel for Dorsey Develoment asked the council to grant the appeal and approve the application. After questions and discussion, the Chair asked for a motion. With no motion the Chair made it known that the ruling of the Planning Commission would stand.

Since the Council did not provide any reasons for its effective denial of the appeal, the only evidence from which to assess the reasonableness of the Council's action is Dorsey's application and accompanying documentation, the video of the Council meeting, and the trial testimony of two Council members. Viewing this limited evidence in light of the particular facts and circumstances of this case, and considering the heightened burden imposed in use by right situations, we cannot say that the Council's decision was based on legitimate concerns for public safety, health, or general welfare. Accordingly, the Council's denial of Dorsey's application is unreasonable, arbitrary, and capricious, and must be reversed.

## CONCLUSION

For the reasons set forth herein, the judgment of the trial court dismissing the petitions of Dorsey Development Company, L.L.C. and Loucile Comish with prejudice is reversed. Costs of this appeal in the amount of $ 3,887.50 are assessed to defendants, Tangipahoa Parish Council-President Government and Tangipahoa Parish Planning Commission.

**REVERSED.**